<pre>
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   United States of America      )
                                   )
 4        v.                       )   Docket No. 5:20-mj-00487-HJB-1
                                   )
 5   Cody Donovan Smith,           )   San Antonio, Texas
                                   )   April 7, 2020
 6        Defendant.               )
     _____)
 7
                 TRANSCRIPT OF VIDEO DETENTION HEARING
 8            BEFORE THE HONORABLE RICHARD B. FARRER
                  UNITED STATES MAGISTRATE JUDGE
 9
     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT (BY VIDEO):
11   Priscilla Garcia
     Assistant United States Attorney
12   601 N.W. Loop 410, Suite 600
     San Antonio, TX 78216
13
     FOR THE DEFENDANT (BY VIDEO):
14   Guillermo Lara, Jr.
     Law Office of Guillermo Lara, Jr.
15   310 S. Saint Mary's Street, Suite 965
     San Antonio, TX 78205
16
     COURT RECORDER:  FTR Gold
17
     Proceedings reported by electronic sound recording.  Transcript
18   produced by computer-aided transcription.

19

20

21

22

23

24

25
</pre>

INDEX

PAGE

JACOB OLSON

Cross-Examination by Mr. Lara ...........................10

Redirect Examination by Ms. Garcia ......................18

1     *(2:30 p.m.)*

2     THE COURT: Okay, everyone. I think we're about ready

3 to proceed. Just making sure we have our recording equipment

4 online.

5     Okay. Are we all set, Amy?

6     THE CLERK: [Inaudible].

7     THE COURT: Sounds good?

8     THE CLERK: I can hear everybody.

9     THE COURT: Okay. All right. We'll start -- we'll

10 start things off. I'll go ahead and call this case. Let me

11 see here.

12     And, Amy, the CR number is the current case number?

13     THE CLERK: [Inaudible].

14     THE COURT: Oh, it's this MJ number?

15     THE CLERK: Uh-huh.

16     THE COURT: Okay. All right. Let's go ahead and call

17 this case. So next up before the Court is case number

18 SA:20-MJ-487, United States of America versus Cody Donovan

19 Smith. We are set for an identity hearing and a detention

20 hearing. We're doing this by video teleconference. And so

21 just to ensure that the record is clear, I have on the

22 teleconference from the detention facility is Mr. Smith.

23     And, Mr. Smith, are you able to hear me and see me?

24     THE DEFENDANT: Yes, sir.

25     THE COURT: Okay. Thank you, sir.

```
 1        And then also on the line we have Mr. Lara, who is
 2   Mr. Smith's counsel.
 3        Mr. Lara, are you able to hear and see me?
 4             MR. LARA:  Yes, Your Honor.
 5             THE COURT:  Okay.  And Ms. Garcia from the U.S.
 6   Attorney's office, can you see and hear me as well?
 7             MS. GARCIA:  [Inaudible].
 8             THE COURT:  Ms. Garcia, are you able to hear me and
 9   see me?
10             MS. GARCIA:  Yes, I can.  It's very [inaudible], Your
11   Honor.  I don't know why.
12             THE COURT:  Okay.  I'll try to -- I'll try to speak
13   loudly.  Does that help?
14             MS. GARCIA:  [Inaudible].
15             THE COURT:  I might just be too soft-spoken.
16        And then, also, we have pretrial services on the line.  Is
17   that right?
18             PRETRIAL OFFICER:  Yes, Your Honor.  Alejandro Cruz.
19             THE COURT:  Okay.  Great.
20        Mr. Lara, let me just start with you.  First up, my
21   understanding is that your client wishes to waive the identity
22   hearing.  Is that correct?
23             MR. LARA:  Yes, Judge.  We discussed it last week, and
24   it was our decision to waive the identity hearing and move
25   forward with the detention hearing.
```

1          THE COURT:  Okay.  So we're moving forward on

2     detention hearing.

3          And then, as I mentioned at the outset, we're conducting

4     this detention hearing by video teleconference because of the

5     current coronavirus/COVID-19 outbreak and situation.  And so I

6     just want to confirm with you, Mr. Lara, that you've had an

7     opportunity to discuss with your client what's involved with

8     conducting this proceeding by video and that your client is

9     comfortable with and does waive his presence at this hearing

10    and also his right to be present here to confront any

11    witnesses.  Is that correct?

12         MR. LARA:  Yes, Your Honor.  We discussed it, as well

13    [inaudible].

14         THE COURT:  Okay.

15         MR. LARA:  [Inaudible].

16         THE COURT:  You're breaking up a little bit.  Can you

17    just go ahead and repeat that for me?

18         MR. LARA:  Yes, Judge.  We want to move forward with

19    the detention hearing.  We have discussed the issue of

20    [inaudible].

21         THE COURT:  Okay.  Thank you.

22         And he's comfortable to waive his presence; is that

23    correct?

24         MR. LARA:  Yes, Your Honor.

25         THE COURT:  Okay.  All right.  And then the intent

here is to proceed by proffer; is that correct, Ms. Garcia?

MS. GARCIA: Your Honor, we'd ask for detention -- to show notice of the pretrial services report prepared by Alejandro Cruz and also the indictment pending in the District of Wyoming, which I had hoped a copy was provided to the Court.

THE COURT: Yes. I have -- I have both of those matters, and I am considering them. I have them here on my screen as I'm talking to you all. So let me just -- if I can, just explain to Mr. Smith briefly.

So what we're doing, Mr. Smith, is addressing the question of bail or pretrial release in this hearing. You're entitled to the presumption of innocence on the underlying charges. And, obviously, nothing that takes place during this hearing is intended to or should be deemed to affect that underlying presumption of innocence. And, likewise, any findings I may issue are also not intended to affect that presumption.

The Bail Reform Act is the statute that applies to the determination that we're -- that we're going to investigate here today and the ruling that I'll make at the end of this hearing with respect to pretrial release or bail. The Bail Reform Act calls me to consider various factors in making my decision. And those include the nature and circumstances of the alleged offense, the weight of the evidence against the defendant, the history and characteristics of the defendant and also the nature and seriousness of the danger to others or the

community.

The government bears the burden in this hearing to show that you need to be detained between now and further proceedings.  And in your case, at least as it stands now, that would be if you -- whether you're detained until further proceedings are set in Wyoming or whether you can be released on bond pending those further proceedings.  But Mr. Lara will be able to talk to you in much greater detail about how things will go forward in terms of what other proceedings may be conducted.

So with that, sort of, general background, I'll turn things over to the government.  And, Ms. Garcia, if you'd like to proceed with your --

MS. GARCIA:  Yes, Your Honor.

THE COURT:  -- with your presentation.

MS. GARCIA:  We proffer, Your Honor --

THE COURT:  It's okay.  Go ahead.

MS. GARCIA:  Can I be heard?

THE COURT:  Yes.

MS. GARCIA:  I proffer the application affidavit of Jacob Olson, which was attached to a search warrant that was [inaudible].

THE COURT:  Oh, I've lost you, Ms. Garcia.  Hold on.

MS. GARCIA:  [Inaudible].

THE COURT:  Our connection -- our connection's tough.

I heard you -- just start over with the proffer.  And then I
lost you a bit.

        MS. GARCIA:  [Inaudible] proffer the affidavit of
Agent Olson.

        THE COURT:  Okay.

        MS. GARCIA:  And in Count 1 [inaudible] when she was
[inaudible].

        UNIDENTIFIED SPEAKER:  [Inaudible] hear?

        THE COURT:  Yeah.  No.  You're breaking up,
Ms. Garcia.  Hold on.  I think we have a tough connection.

        MS. GARCIA:  [Inaudible].

        THE COURT:  Yeah.  No.  We're having a tough time
hearing you.  So why don't we try one more time, Ms. Garcia.
You've --

        MS. GARCIA:  Am I heard at all or --

        THE COURT:  You are.  And it sounds like your internet
connection is a little bit dicey.  And so you're coming in and
out.  Why don't we try one more time.

        MS. GARCIA:  Okay.  I'll get closer.  I proffer the
affidavit of Agent Olson which accompanies his application for
a search warrant in Florida to search the vehicle operated by
Cody Smith when he kidnapped the victim and took her into
Yellowstone Park.  It outlines everything that happened between
-- as relayed by the victim, and then the investigation that
followed in securing a photograph of [inaudible] car as it

1 entered Yellowstone; and would tender calls, registration

2 communication between he and the victim leading to the search

3 in Florida, the vehicle in which he was operating.

4      And I have Agent Olson online as well, Your Honor,

5 participating in this video conference, in the event that

6 there's questions.

7           THE COURT:  Okay.  So I have the written proffer, at

8 least the written materials that are proffered.

9      Mr. Lara, how do you -- how would you like to proceed?

10           MR. LARA:  Judge, I had a few questions for Agent

11 Olson [inaudible].  Not too many, just a few questions to ask

12 him [inaudible] that affidavit.

13           THE COURT:  Okay.  Let's see if -- let's see if

14 that -- if we can pull that off.  Just don't be afraid to speak

15 up.  I think it's better to be loud than not heard.

16      Now, do we have Agent Olson on the line?

17           THE WITNESS:  I'm here.  Can you hear me okay?

18           THE COURT:  Yes.  I can hear you.

19      Mr. Smith, can you hear Agent Olson?

20           THE DEFENDANT:  Yes, Your Honor.

21           THE COURT:  Okay.  Mr. Lara, why don't you just

22 proceed?

23           THE WITNESS:  [Inaudible] excuse me.  My computer just

24 died, for whatever reason.  So I'm on a cellphone.  So I don't

25 have the affidavit in front of me.  So I'll try to do the best

1  I can.  I apologize.

2        THE COURT:  Okay.  And let me just -- since you're

3  going to testify -- so why don't I just go ahead and place you

4  under oath.  Will you please raise your right hand?

5      (The oath was administered)

6        THE COURT:  Okay.  Thank you

7      Mr. Lara, go ahead

8        MR. LARA:  Sure.

9                    CROSS-EXAMINATION

10 BY MR. LARA:

11 Q.  First of all, I just wanted to -- Mr. Olson, can you hear

12 me clearly?

13 A.  Yes, sir.

14 Q.  Okay.  First of all, I just wanted to clarify, Mr. Smith

15 was booked into custody.  And are you aware whether or not he

16 complied with the agents who arrested him on that day, in

17 March?

18 A.  Oh, per the arresting officers [inaudible].

19 Q.  He didn't attempt to flee or run from the agents that were

20 there on the -- on the scene?

21 A.  I was -- I was told that he was very compliant.

22 Q.  Okay.  Now, I wanted to ask you a few questions.  The

23 affidavit, which was proffered to the Court, that was done by

24 you in conjunction with officers from Idaho; is that correct?

25 A.  It was drafted by me, using some additional information

1  from Rexburg, Idaho police department.

2  Q.  Okay.  And I just wanted to clarify a few things that I

3  noticed in the affidavit, if you could answer some of these.

4  Do you have any photographs of the alleged knife that was used

5  in this incident?

6  A.  [Inaudible].

7  Q.  Is it a no?

8  A.  As of right now, no.  There was a knife located during the

9  vehicle search.  I have yet to see those photos yet.

10 Q.  Okay.  And are you aware that that was the type of knife

11 described by the complainant?

12 A.  I'm unaware because I haven't seen the photos yet.

13 Q.  Okay.  Now, I wanted to ask you, with respect to the

14 information that [inaudible] by H.P. in this case, did you

15 speak to H.P. directly?

16 A.  Yes.

17 Q.  Okay.  In your conversations with H.P., as far as the

18 initial encounter with Mr. Smith, was the knife in question --

19 do you have information to suggest that that knife was used in

20 direct threat to H.P.?

21 A.  The information [inaudible] specific [inaudible] issue.  So

22 the knife was pulled out, brandished during the time that they

23 were in the car from [inaudible] pocket of his pants.  It was

24 shown to the victim.  And then looked at the victim with the

25 knife [inaudible] center console [inaudible].

Q. Okay. And just to be clear, that has been reported at some point in your investigation?

A. Yes, sir.

Q. Okay. Now, let me -- let me follow with that. So was the knife brandished, as you described it -- does that -- did that happen before or after the [inaudible].

A. I'd have to go back and review exactly [inaudible]. But I believe --

Q. Okay. Had you taken -- were any photographs taken of any injury she may have sustained by the use of a knife or anything of that nature?

A. No.

Q. Okay. Now, according to the affidavit, these two, Mr. Smith and H.P., met on a dating app?

A. Correct.

Q. And is that something that's common for individuals at their age, approximately 19 and 18; to meet on these social media apps?

A. I would assume so. I'm outside that age group, so I can't [inaudible] say. But I believe [inaudible].

Q. Okay. And there's nothing out of the ordinary with someone of Mr. Smith's age getting on an app like that and meeting someone his age as well, right?

A. I don't see anything improper about that.

Q. Would you agree that -- and I'm not sure what your

1  experience is with respect to investigation -- you know, you've

2  had the opportunity to investigate online predators?

3  A.  Yes.

4  Q.  Would you agree that this situation is completely different

5  than something where -- let's just say, for example, someone

6  groomed another individual to meet them, you know, and that

7  type of nature of a case, right?  This is a completely

8  different case?

9  A.  I'm not sure I agree to that.

10  Q.  Okay.  Do you -- with respect to the information that you

11  obtained from H.P.'s cellphone, do you have a complete list of

12  all the conversations she had with Mr. Smith?

13  A.  I have a Tinder conversation that was obtained [inaudible]

14  warrants -- Tinder application.  I'd have to go back and review

15  the cellphone for any text messages.  But I believe the Tinder

16  conversation [inaudible], and then there were some phonecalls.

17  Q.  Okay.  Now, the affidavit suggests that H.P. objected to

18  going to the state -- the national park; is that right?

19  A.  That's correct.

20  Q.  Now, did she indicate in her conversations with you whether

21  or not there was an opportunity for her to get out of the

22  vehicle?

23  A.  You're going to have to be more specific about your

24  question.  I apologize.  I don't know exactly what you mean.

25  Q.  Sure.  Just [inaudible].  It's a simple question.  Did she

1  [inaudible] -- in your conversations with H.P., that at any

2  point there was an opportunity for her to remove herself from

3  the Honda Civic?

4  A.  Her indications were that she asked him to take her back to

5  her apartment.  He would not take her back [inaudible], and

6  then proceeded to go to Yellowstone National Park where

7  cellphone service and such became way more -- the phone was

8  taken during that time as well.

9  Q.  Did she indicate [inaudible] out of her hand?  How did --

10 how did he [inaudible]?

11 A.  From what I -- from what I understand, she was holding the

12 phone, and he took it from her.

13 Q.  Did he use force against her to take that phone?

14 A.  I don't know what you mean, sir.  He took the phone from

15 her.  You know, he didn't punch her before he did it, but he

16 took the phone from her.  She was in [inaudible].  He was

17 driving.

18 Q.  Okay.  And that's what I'm getting at.  I was looking at

19 the affidavit.  It didn't have any specific with respect to how

20 did it happen, when did it happen.  It just says, the phone was

21 taken.  Right?

22 A.  Okay.

23 Q.  And that's the point.  I just wanted to find out the nature

24 of how he obtained the phone.

25      So shortly after that, they arrived at a camp site; is that

1  right?

2  A.  I'm not sure about "shortly."  A couple of hours.

3  Q.  Okay.  Now, in the affidavit it indicates that she removed

4  herself from the vehicle and got into the tent; is that right?

5  A.  No.

6  Q.  Now, could you explain that to me then?

7  A.  Yeah.  She was able to get out of the vehicle when they got

8  to the camp site.  She was able to grab her phone at that

9  point.  She went into a women's restroom, approximately the

10 third stall down, and then he followed her into the women's

11 restroom, stood outside the stall.

12 Q.  And the reason I ask is, it's not in the affidavit, so I

13 wasn't aware of those details.

14 A.  Okay.

15 Q.  I was simply going based on the affidavit, which suggests

16 that she arrived at the location, got out of the vehicle and

17 entered the -- and entered the tent.

18 A.  Okay.

19 Q.  So when she's in the tent, she has her phone; is that

20 right?

21 A.  No.  He ended up keeping the phone on his side of the tent

22 for a portion of [inaudible].

23 Q.  Okay.  And then -- and did you -- did you verify whether or

24 not she had an opportunity to send any messages while she

25 [inaudible] or at the location of the camp site?

1  A.  Yes.  There's no -- there was no cellphone service there

2  for her, or at least that's what [inaudible] her.  So she

3  wasn't able to get messages out till the following day.

4  Q.  Okay.  And were there any other individuals in that camp

5  site where Mr. Smith and H.P. were located in that tent?

6  A.  She was unaware.  When they arrived, it was very dark, late

7  at night, and she couldn't see anybody else.  [Inaudible] to

8  keep her voice down because he said there was other people.

9  Q.  Okay.  And, again, would you agree with me that the

10  information that you're providing the Court today is based on

11  the information that was given to you from H.P., right?

12  A.  Yes.

13  Q.  So would you agree with me that the strength of the

14  information that you're providing is, again, based on the

15  information that was provided to you through another party in

16  this case, correct?

17  A.  It was provided by H.P.  I don't understand the question.

18  Q.  So with respect to the information that the Court has to

19  make their decision as to the offense itself, that information

20  was provided primarily from H.P.?

21  A.  What specific information are you -- the question that you

22  just asked, the answers to those questions were provided by

23  information given from H.P., correct.

24  Q.  Okay.  That's all I wanted to know, is whether or not the

25  information that we're giving the Court, facts that we're

1  giving the Court are, again, provided from H.P.  And that's all
2  I wanted.
3      So would you agree with me that these specific types of
4  cases are -- been categorized as a he said/she said type of
5  case?
6  A.  I don't particularly agree with categorizing them as that,
7  no.
8  Q.  And why is that?
9  A.  Because I believe that the initial evidence that we've gone
10 into in regards to [inaudible] search warrant [inaudible] and
11 things help provide more evidence towards [inaudible].
12 Q.  Now, that evidence that you just indicated right now, do
13 you have that evidence?  Do we have that evidence in front of
14 [inaudible]?
15 A.  You have an affidavit, I believe.  I don't think
16 discovery's been provided yet.
17 Q.  Okay.  So the only information that the judge has right now
18 to analyze these facts are provided from H.P., right?  Not
19 including the information that was [inaudible], right?
20 A.  Okay.  I'd have to see which affidavit -- see the affidavit
21 [inaudible] to see if there --
22 Q.  Okay.
23 A.  -- from [inaudible].
24 Q.  Okay.  Now, let me just make sure I have this straight.
25 The crime was reported on September the 10th, 2019, correct?

1  A.  Negative.  It was provided September 8th.

2  Q.  Okay.  And I'm just clarifying that because the affidavit

3  would suggest that she provided district court with the agents

4  on -- excuse me -- not the agents but the officers from the

5  police department on September [inaudible] in the probable

6  cause section on Page 2 of the affidavit.

7  A.  She did a follow-up with that agency on September 10th, I

8  believe.  September 8th, minutes after returning to town, her

9  roommates pick her up, and they went directly to the Rexburg

10  Police Department where [inaudible].

11  Q.  Okay.  Thank you for clearing that up.  [Inaudible] of the

12  affidavit.

13      Now, if you know, do you know if Mr. Smith attempted to

14  contact or threaten H.P. after the alleged incident?

15  A.  There is no report of that.

16          MR. LARA:  I have no further questions for the agent,

17  Your Honor.

18          THE COURT:  Okay.  Thank you.

19      Ms. Garcia, do you have anything you'd like to follow up

20  on?

21          MS. GARCIA:  Yes, Your Honor.  I do.

22                      REDIRECT EXAMINATION

23  BY MS. GARCIA:

24  Q.  In regard to the question posed to you whether there were

25  any photographs of injuries as a result of the knife, you said

1  no.  However, will you describe to the Court any photographs

2  where there is displayed injury to the victim?

3  A.  [Inaudible].

4  Q.  Did you hear me?

5  A.  [Inaudible].

6      THE COURT:  Why don't you repeat that question?

7      THE WITNESS:  [Inaudible].

8  BY MS. GARCIA:

9  Q.  Agent Olson.

10  A.  Yes, ma'am.

11  Q.  Can you hear me?

12  A.  Yeah.  I can hear you now.  [Inaudible].

13  Q.  Agent Olson, you were asked questions about any injury as a

14  result of the knife that Mr. Smith had.  And you said there

15  were none.  Can you describe to the Court any injuries that you

16  observed in photographs of the victim?

17  A.  Yes.  The victim has photos of a small abrasion on her

18  neck, some marks on her breast, and then reported some initial

19  scratches on her stomach.  She also has multiple photos of a --

20  I don't remember the name of it, but the muscle between the top

21  bend in your thumb was torn.

22      THE COURT:  Okay.  Anything else, Ms. Garcia?

23      MS. GARCIA:  Nothing else, Your Honor.  Thank you.

24      THE COURT:  Okay.  Do you have anything further that

25  you'd like to put before the Court, Ms. Garcia, apart from

1  arguing?

2          MS. GARCIA:  Just in regard to -- if the agent will

3  please describe the area that she's in.

4  BY MS. GARCIA:

5  Q.  It's not like there's a lot of towns around there, is

6  there?  Is it woodsy?  Houses?  Basic [inaudible].

7          THE COURT:  Were you able to hear that, Agent Olson,

8  that question?  We have a pretty dicey connection, folks.  Can

9  you hear me, Agent Olson?

10          MS. GARCIA:  [Inaudible].

11          THE WITNESS:  Is this [inaudible]?  Yes.

12          MS. GARCIA:  That's a lot [inaudible].

13          THE WITNESS:  I'm sorry.

14  BY MS. GARCIA:

15  Q.  [Inaudible] Would you please describe the environment in

16  which the victim was taken as far as being woodsy, houses?

17  What is it?

18  A.  Yes.  The area where they left in Rexburg -- they left

19  Idaho and drove toward Montana and then entered the west

20  section of Yellowstone and then went into a campground within

21  the interior of the park.  And it's very remote; no cellphone

22  service; really dark; obviously, big woods of Montana and

23  Wyoming.

24          THE COURT:  Okay.  Anything --

25          MS. GARCIA:  Other than that, Your Honor, nothing

1  further.

2          THE COURT:  Okay.  Mr. Lara, any further questions?

3          MR. LARA:  No further questions for the agent, Judge.

4          THE COURT:  Okay.  Thank you, Agent Olson.  You may --

5  you may be excused.

6      Anything else that you'd like to introduce, Ms. Garcia?

7  Other evidence?

8          MS. GARCIA:  Nothing for the government, Your Honor.

9          THE COURT:  Okay.  Mr. Lara, do you have any evidence

10 you'd like to proffer or otherwise introduce?

11         MR. LARA:  Yes, Judge.  Yesterday afternoon we sent

12 over to the Court a few affidavits as exhibits.  Exhibit Number

13 1 is detailed information from Bank of America for Tammy

14 Smith --

15         THE COURT:  Okay.

16         MR. LARA:  -- Cody Smith's mother.  It's a mortgage

17 for her home.

18         THE COURT:  I have that.

19         MR. LARA:  Exhibit Number 2, Judge, the Court has the

20 flight itinerary from Florida to Wyoming district court for

21 Mr. Cody Smith that was purchased by Tammy Smith to make sure

22 that he can arrive for his Wyoming court date should the Court

23 grant him a bond.

24     Defendant's Exhibit Number 3 are taxes from Cody Smith for

25 2018, the most recent taxes that he has, provided to the Court

1  to show that he has been employed prior to this incident.

2  Exhibit Number 4 are documents from Cody Smith of his

3  enlistment with the Navy, Your Honor.  That was provided in

4  Exhibit Number 4.  And that's exactly where he was apprehended

5  on this matter.

6  Exhibits 5 through 11, those are a series of affidavits and

7  letters from the family.  I'm not sure if the Court had an

8  opportunity to read those.  They do provide information from

9  Tammy Smith, Donovan Smith, his father, as well as his

10 grandfather from his maternal side and grandmother from

11 maternal side, as well as his grandmother from the paternal

12 side, all vouching for his character as well as willingness to

13 be a third-party custodian in this matter as well as providing

14 collateral for the Court should they grant a bond.

15 Exhibit Number 10 and 11, Your Honor, are letters from

16 family friends attesting to his character; provided the Court

17 that as well.

18 And then, lastly, we have Exhibit Number 12, which is a

19 copy of his passport, which his mother has brought here to

20 Texas.  She's presently sitting alongside of me in my office,

21 Your Honor.  She brought the passports.  The Court may find, as

22 [inaudible] of the bond, he would surrender that as part of the

23 -- of that.  So, again, it's Exhibit Number 12, Your Honor.

24 Those are the exhibits that we ask to present to the Court

25 and submit as evidence on his behalf.

1    THE COURT:  Okay.  Thank you, Mr. Lara.  I do have all

2  those here in front of me and have them on the screen right

3  now.

4    Okay.  Anything else, Mr. Lara, to introduce into evidence

5  before we get into argument?

6    MR. LARA:  No, Your Honor.  I believe that's all we

7  had in terms of exhibits for evidence, Judge [inaudible].

8    THE COURT:  Okay.  Ms. Garcia, do you want to begin

9  with your argument for detention?

10    MS. GARCIA:  Yes, Your Honor.  With respect to the

11  affidavits provided by Mr. Lara, it shows that the defendant

12  has a lot of great family support.  However, there seems to be

13  this notion that there's a misunderstanding about something.

14  When we're dealing with victims, especially victims who have

15  been kidnapped, sexually abused in any way, there's no

16  misunderstandings, especially when there's evidence to support

17  injuries and documentation by photographs, for example,

18  photographs of the vehicle entering Yellowstone Park, and

19  everything is confirmed as to what the victim reported.  So

20  there's no misunderstanding.

21    And in this particular case, kidnapping carries a penalty

22  of up to life, Your Honor.  And the fact that he brandished the

23  knife, he showed it to her [inaudible] as a form of

24  intimidation.  These are acts that [inaudible] do not warrant

25  one being released on bond.

The fact that the defendant -- the victim repeatedly told him no, not to take her and he [inaudible] Yellowstone. And he had his tent already set up there. That's all premeditated. They wouldn't accept the [inaudible] self-prove [inaudible] despite the praises that he receives from his family.

This is the only incident that we're aware about. We don't know this happened to anyone else [inaudible] has. But the fact that this [inaudible], it did happen.

Now, with reference to the affidavits, the mother -- the mortgage shows that she's only been in that house for one year and four months. Therefore, there's little equity in that house.

As far as the ticket itinerary, you can buy a ticket. Whether he'd get on that plane and show up, that's a different matter. So it's the government's position that the best decision here is to keep Mr. Smith in detention, especially in light of some of these affidavits describing his -- describing him as an adventurous person who was traveled to Cuba, South Africa, Australia. Then there is a chance of flight risk, Your Honor. So based on a chance of flight risk and the fact that he is a danger [inaudible].

THE COURT: Okay. We just missed that last part. You said -- you were just summing up that you're requesting detention based on flight, and then you cut out. Why don't you just repeat that part.

1    MS. GARCIA:  And danger to the community as well, Your

2  Honor, based on the facts and circumstances of this case.

3    THE COURT:  Okay.  Thank you, Ms. Garcia.

4  Mr. Lara?

5    MR. LARA:  Yes, Your Honor.  First of all, Judge, I

6  want -- I want to just communicate that I don't believe that

7  the government has even come close to providing a preponderance

8  of the evidence standard on the flight risk issue, number one.

9  Number two, on the dangerousness issue, Judge, I think

10 they've fallen completely short of providing clear and

11 convincing evidence to suggest that he's a danger to the

12 community.

13 Now, I wanted to address some of the factors that the Court

14 would consider, this Court is clearly aware of, 3142(g), to

15 determine whether or not detention is warranted here.  In

16 looking at the affidavits and the nature of the offense

17 charged, that seems to be the majority of what the government's

18 arguing.  The government is essentially just arguing the nature

19 of the offense.  That's what they're expecting the Court to

20 make their decision on, in saying, This is the type of offense

21 that we don't let people out on bond for.

22 Now, I would -- I would -- my position, Judge -- and,

23 again, a majority of the information that the Court has to

24 determine is based on an affidavit which was provided from an

25 individual -- again, it's a he said/she said type of situation,

Your Honor.  And that's what the Court is being asked from the government to make its ruling upon.

Now, if the Court looks at the weight of evidence against a person, Mr. Smith is presumed innocent.  And the Court is aware of that and has mentioned it, as well.  He has a presumption of innocence.  And that carries a lot of weight, Your Honor.

If we look at the history and characteristics of the person here, the affidavit provided by Mrs. Smith, Tammy Smith, including [inaudible] to the Court, that not only is she willing to sign as a third-party custodian.  She is going to put up her own property; not only the home, whatever property she needs to put up, in order to make sure that her son, her 20-year-old son gets out on bond, she is willing to do that because she knows -- again, she knows that -- who her son is. She knows that he is going to comply with every condition this Court would impose.

Not only that, Your Honor, if you look at the history and characteristics of this individual, we're talking about Mr. Smith here who recently was [inaudible].

(Cellphone ringing loudly)

MR. LARA:  -- as a medic in the Navy [inaudible], to the point [inaudible] where he was, was in the final stages of completing that training.  Mr. Smith has no intention of leaving this country, has no intention of fleeing from the United States and not presenting himself against these false

accusations.

Now, again, there's a time and there's going to be the place for us to argue that, Your Honor, with respect to the elements of the case. We just ask the Court to consider all the factors this Court will consider in making a determination based on, again, his mother standing behind him. She has at least a hundred thousand dollars equity in that home. Her -- his grandfather is standing behind him. He's also willing to sign as a third-party custodian. His grandmother is also willing to stand and sign as a third-party custodian. They have strong roots to Florida, Your Honor.

And clearly, the family supports this young man because he's done nothing but be an outstanding, again [inaudible]. Now, when the Court looks at employment history, we provided the Court his history, 2018. He was in high school prior to that. So there wasn't much time to [inaudible] his job. His father has clearly indicated, should he be given a bond, he's going to work with him. And if he's working with his father, that means that he would be an individual that's going to be supervising him throughout the day should the Court allow him to work during the period awaiting for an appearance in court in Wyoming.

Now, when we look at the financial resources -- now, the government made -- indicates that he's a flight risk [inaudible] South Africa. Judge, that doesn't hold [inaudible]

willing to submit to the Court and surrender his passport, he's not going to travel anywhere. Much less, with the situation that we have right now with COVID-19, that there are travel restrictions. He's not going anywhere. He's going to be home. He's going to be with his family.

And the Court can further even apply house arrest. If that wasn't enough, the Court could [inaudible] GPS. In the pretrial services report the pretrial services officer also indicated that the mother is willing to install a landline and do anything this Court would ask, to make sure someone is supervising him at all times. Is it necessary? I don't believe so. But that's to the extent that they're willing to go to assure that there are some conditions that can be given to this individual.

Now, the length of the residence in his community in Florida, he's lived there all his life. All his family lives there. And, Judge, he is not going anywhere. We have affidavits that support that. Friends of the family, community ties, again, he has people that are looking out for him there in Florida where his family resides. He's not a flight risk.

Now, past conduct, he has no criminal history. He's never been in trouble before. There is no indication that he's a threat to anyone. The [inaudible] officer, the agent testified that there is no evidence to support that he attempted to reach out to this individual; that he attempted to speak to this

1 individual after these [inaudible] have occurred.

2     Again, if we were in a situation where this man was a

3 stalker, where he was looking for this individual, possibly I'd

4 understand, at least [inaudible]. But Mr. Smith has made no

5 contact with this individual. He was, again, in the Navy,

6 doing what he wanted to do as a medic.

7     And, Your Honor, if the record -- he doesn't have a record,

8 so we can't really provide the Court assurances of his past

9 appearances in court. But I don't think that should go against

10 him simply because he has [inaudible]. Now --

11         THE COURT: Mr. Lara, can I just ask you -- just break

12 down for me what happens practically next in this case. If

13 he's set for proceedings, he's either going to be in custody

14 and transported or he'll go back to Florida and have a court

15 date in Wyoming; is that right? Is that what's going to happen

16 next for him?

17         MR. LARA: I'm sorry. Were you asking me, Judge?

18         THE COURT: Yes.

19         MR. LARA: Okay. So what would happen if he's not

20 granted a bond in this situation, they would take him out to

21 Wyoming. At Wyoming they would either attempt another

22 detention hearing pending the resolution or the scheduling

23 order from the Court. If he's granted a bond, he would go out

24 to Florida and await a scheduling order. We already have an

25 attorney out there in Wyoming. He's been retained to make sure

1  that he is going to comply with all settings out there in
2  Wyoming.
3      So if he gets a scheduling order, which is typically, in
4  situations like this [inaudible], Your Honor -- it's typically
5  a month and a half when it's out of state, usually when they
6  set hearings [inaudible].  Judge, with the situation right now
7  with the virus, I don't know how soon that would be set.
8  However, it could be even two months, three months down the
9  line before he gets another hearing, another setting.  And
10 that's what -- that's what I'm afraid of, Your Honor.
11          THE COURT:  Okay.  Well, you know, what I wanted to
12 clarify just for the record and also for Mr. Smith's benefit is
13 that if he were to be detained, he would have an opportunity to
14 revisit that decision with the Court in Wyoming, the Court that
15 has jurisdiction over the charged offense.  And that's your --
16 that's your understanding as well, it sounds like, Mr. Lara; is
17 that right?
18          MR. LARA:  Yes, Your Honor.  That is -- that is
19 correct.
20          THE COURT:  Okay.  And I interrupted --
21          MR. LARA:  Just --
22          THE COURT:  Yeah.  I interrupted you.  Please go ahead
23 and finish up.
24          MR. LARA:  No, Judge.  Just looking at our position,
25 Judge, we believe that there are [inaudible] conditions

available which would reasonably assure his appearance for all judicial hearings and which would adequately protect the public, Your Honor.  And that's the standard here, of would it reasonably assure.  There is not a requirement that it absolutely guarantees.  I believe with the affidavits provided, that would [inaudible] hearings in the state of Wyoming, Your Honor.

We've also provided a release to a third-party custodian, surrender of his U.S. passport, home detention if necessary, GPS monitoring if necessary, any other conditions the Court would impose.

And we, frankly, Judge, believe that the only credible argument from the government here is the nature of the offense. The government argues for detention.  We believe detention is insufficient to overcome his presumption of innocence and the Court's obligation under the Bail Reform Act to release [inaudible] on the least restrictive combination of conditions. We believe we've presented the Court with sufficient amount of conditions that can be [inaudible] to assure that he's not a flight risk [inaudible] and, two, that he is not a danger to anyone if he's being supervised 24/7, GPS, anything [inaudible].

THE COURT:  Okay.

MR. LARA:  And that's all.

THE COURT:  Thank you.

1    Ms. Garcia, anything to follow up on?

2         MS. GARCIA:  Yes, Your Honor.  Just as to -- the Navy

3    thing is recent.  We believe that all began the end of March.

4    So it's not like he was in the Navy in September when this

5    offense was committed.

6         THE COURT:  Okay.

7         MS. GARCIA:  And the defense [inaudible] saying it's a

8    he said/she said.  No.  It's she said.  And what she said is

9    supported by evidence, supported by injury to her person,

10   supported by the photographs, supported by records, all

11   consistent with her description of the events that transpired.

12   So it's not a he said/she said.

13        And as far as what's been presented today, there's no

14   evidence rebutting the fact circumstances of the offense.  It

15   is truly what the victim has said, what the agent -- his

16   follow-up as far as the investigation for search warrant,

17   et cetera.

18        And [inaudible] they referred to the strong [inaudible] of

19   family in Florida.  In all the affidavits, the only thing I

20   ever saw was someone who has known the family for 35 years.

21   Other than that, they don't establish how long they've

22   [inaudible].  They say several, several years.  "Several" can

23   mean anything.

24        And it also -- Mr. Lara emphasized that there is no flight

25   risk.  Your Honor, this defendant has absolutely no ties to

Wyoming, absolutely none.  And being in Florida I think would
lend itself to a lot of potential ways that he could leave the
country.  And, therefore, the government maintains that
detention is the best thing in this case.

    THE COURT:  Okay.  Thanks, Ms. Garcia.  Just one
follow-up question.  There's no presumption in this case; is
that correct?  The victim here was not a minor; is that right?

    MR. LARA:  That's correct, Your Honor.

    MS. GARCIA:  Other than the --

    THE COURT:  Go ahead.

    MS. GARCIA:  [Inaudible], Your Honor.  Just that
[inaudible] there is the range of punishment.  And this -- the
kidnapping is up to life.

    THE COURT:  Okay.  But --

    MS. GARCIA:  [Inaudible].

    MR. LARA:  I just wanted to clarify one -- just one
point.

    MS. GARCIA:  -- [inaudible] factor.

    THE COURT:  Go ahead, Mr. Lara.  Go ahead.

    MR. LARA:  Just one point, Judge.  Mr. Smith has been
enlisted in the Navy since May of 2019.  It's not something
that he just woke up one day in January and decided to do it.
He's been in the Navy.  As soon as he graduated, he enlisted.
And all of the trips that he's taken, he's taken with family as
well, Judge.  I just don't see the issue there with the flight

1    risk, Judge.

2           THE COURT:  Okay.  Thank you, Mr. Lara.

3       All right.  Well, I think I have --

4           MR. LARA:  Thank you, Judge.

5           THE COURT:  I think I have the information that I need

6    here, thanks to all of you.

7       And look, Mr. Smith, this is -- what I said at the outset

8    remains true; that you're entitled to the presumption of

9    innocence in this case.  And Mr. Lara has presented a very

10   strong case for you to get bail.  I have a recommendation from

11   pretrial services that recommends against that.  But he has --

12   he has very ably, you know, attacked that recommendation.

13      But ultimately, my conclusion here is controlled or

14   compelled in my view by the -- by the fact that there was a

15   knife involved in this case.  I think if we were to take out

16   the weapon and the credible evidence that we heard today at the

17   hearing about the involvement of a nice -- of a knife in the

18   testimony from Agent Olson -- which, by the way, I credit.  I

19   find that testimony credible.  That, I think, is what -- is

20   what makes this case one that sort of pushes it over the edge.

21   There's a number of things that play into that, but that's

22   really the -- ultimately the thing that pushes this case for me

23   into one where I'm not going to be able to give you a bond.

24      But I just want to emphasize that, to me, this is a very,

25   very close case and one that I fully expect my -- where this

issue might be revisited by the Court in Wyoming. You know, the Court there has got to be assured with respect to your ties to Wyoming or with respect to your ability to get up to Wyoming. And so what we're -- so what we're addressing right now is what happens to you pending when you get on up to Wyoming and have an opportunity for them to take a look at this issue.

So I'm going to order that you be detained. I find that the government's met its burden in this case with respect to flight and dangerousness. It's two different burdens. It's a preponderance of the evidence with respect to flight, and it's clear and convincing evidence with respect to dangerousness. And much of that conclusion is informed by the nature and circumstances of the alleged offense. And at this -- at this stage -- at this stage these are just allegations, and I recognize that. But there were injuries involved. The nature of the offense is a -- is a kidnapping. It carries up to a life term of imprisonment. Obviously, your criminal history is clear. And so that would play into things as well later on.

But there's also, as we heard, some evidence introduced at this stage of premeditation as well. And so all of that plays into my conclusion and ultimately leads me to conclude that you'll be detained.

Okay. Mr. Lara, is there anything further from you, sir?

MR. LARA: Nothing further at this time, Judge.

```
 1          THE COURT:  Okay.  Thank you, sir.
 2      Ms. Garcia, anything further from you?
 3          MS. GARCIA:  No, Your Honor.  Thank you.
 4          THE COURT:  Okay.  All right.  So, Mr. Smith, as I
 5  mentioned, you'll be held in custody, and you'll be moved on up
 6  to Wyoming where proceedings will continue.  That may take a
 7  little bit of time.  And, obviously, with the current crisis,
 8  we're not sure how long that's going to take.  But as I
 9  mentioned, I fully expect that this issue may be revisited.
10  Okay?
11      That's all I have.  Thank y'all, everybody.  You may be
12  excused.  Court will be in recess.
13  * * *
14      (3:18 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Date:  4/24/2020      /s/ Chris Poage
                      Approved Transcriber